**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | | |
|---|---|---|
| **B.S.S.B., INC.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No.** |
| | : | **7:08-CV-112 (HL)** |
| **OWNERS INSURANCE COMPANY,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |
| | : | |
| _____ | : | |

## <u>ORDER</u>

Before the Court is Defendant Owners Insurance Company's ("Owners")
Motion for Summary Judgment (Doc. 16) and Motion to Exclude John Huggins as
an Expert Witness (Doc. 15).  For the following reasons, Owners' Motion for
Summary Judgment is granted and Owners' Motion to Exclude John Huggins as an
Expert Witness is denied as moot.

## I.    COMPLIANCE WITH LOCAL RULE 56

Plaintiff, B.S.S.B., Inc. ("B.S.S.B."), failed to comply with its obligations under
this District's Local Rules when it filed its response to Owners' Motion for Summary
Judgment.  Local Rule 56 requires that a party responding to a motion for summary
judgment include a "separate and concise statement of material facts."  The party
must respond "to each of the movant's numbered material facts." Otherwise, "[a]ll

material facts contained in the moving party's statement which are not specifically controverted in respondent's statement shall be deemed to have been admitted, unless otherwise inappropriate."

B.S.S.B.'s statement of material facts is a statement of the issues, rather than the facts, it argues are genuine.  The statement does not respond to each of the Owners' numbered material facts.  Thus, the Court could deem the facts in Owners' statement admitted.  Nevertheless, requiring B.S.S.B. to re-submit its statement of material facts would delay the disposition of the summary judgment motion, and the Court can review the relatively small record to determine whether there are genuine issues of material fact.  Accordingly, the Court will not penalize B.S.S.B. for failing to comply with Local Rule 56.  The facts in Owners' statement of material facts are not admitted.

## II.    FACTUAL AND PROCEDURAL BACKGROUND[1]

Owners issued B.S.S.B. an insurance policy ("policy") on July 11, 2006.  (Def. Ex. A Part 1).  The policy provided property coverage to B.S.S.B. for a hotel it owned called the Relax Inn.  (Def. Ex. A Part 1).  The hotel was located at 4145 Barneyville Road, Sparks, Georgia.  (Def. Ex. A Part 1).  The policy's term of coverage was from August 4, 2006 to August 4, 2007.  (Def. Ex. A Part 1).

On July 14, 2007, while the policy was in effect, B.S.S.B.'s hotel was damaged

---

[1] The Court views the facts in the light most favorable to B.S.S.B.

by a wind and rain storm.  (Dipakkumar Ghodiwala Aff. at 2).  B.S.S.B.'s owner, Dipakkumar Ghodiwala, notified Owners of the damage to the hotel. (Dipakkumar Ghodiwala Aff. at 2).

B.S.S.B. hired John Huggins ("Huggins"), a public adjuster, to determine the amount of damage the storm caused to the hotel and its operations.  (Huggins Dep. at 33-36).  On August 29, 2007, Huggins submitted a proof of loss to Owners.  (Pl. Ex. 3).  According to Huggins' calculations, the cost to replace the damaged parts of the hotel totaled $85,127.85.  (Pl. Ex. 3).  He testified that repairs to the property could be completed in three months.  (Huggins Dep. at 58).

Also on August 29, 2007, Mark Smith ("Smith"), Owners' field claim representative, wrote Huggins explaining that according to Owners' investigation, the only covered damage determined to exist at that time was in the hotel's lobby and restaurant.  (Pl. Ex. 4).  For this damage, the total amount owed to B.S.S.B. was $19,679.09, but B.S.S.B.'s deductible payment would reduce Owners' obligation to $17,179.09.  (Pl. Ex. 4).  The letter also explained that Owners was only obligated to pay the actual cash value of the property loss, totaling $9,336.99, until the damages were actually repaired.  (Pl. Ex. 4).

On September 5, 2007, Owners issued B.S.S.B. an initial check for $9,366.99 in payment for the actual cash value of the damaged property found in the hotel's lobby restaurant.  (Pl. Ex. 4 and 6).  On that same day, Huggins submitted another proof of loss to Owners claiming $222,873.31 for the damaged property in the hotel.

3

(Pl. Ex. 5).

On September 10, 2007, Huggins wrote Smith asking that Owners pay B.S.S.B. for losses pursuant to the policy's loss of business income provision. According to Huggins, the hotel had generated no income since July 14, 2007. (Pl. Ex. 7).  He believed that B.S.S.B. was entitled to recover $315,330.10 for twelve months of lost revenue.  (Pl. Ex. 8).

Smith responded to Huggins' request for lost business income.  He stated that based on his investigation of the hotel's premises, the hotel was still in operation and it could rent out its rooms to guests.  (Pl. Ex. 9).  Therefore, B.S.S.B. was not entitled to recover any payment for lost income caused by the storm.  (Pl. Ex. 9).  Smith added, however, that Owners would consider a claim for loss of business income if B.S.S.B. submitted supporting documentation "that warrants [the claim] to be paid." (Pl. Ex. 9).

B.S.S.B. was dissatisfied with Owners' initial refusal to pay its loss of business income claim and with Owners' decision to initially pay $17,179.09 for the property damage claim.  The reason for B.S.S.B.'s dissatisfaction was that it was concerned about losing its hotel to foreclosure.  (Pl. Ex. 10).  According to B.S.S.B., if Owners promptly paid its loss of business income claim and paid more for the property damage claim, then foreclosure would be unlikely because repairs to the property

could be made and business would increase.[2]  (Pl. Ex. 10).

In attempt to resolve the dispute surrounding the value of its claims, B.S.S.B. made a settlement offer to Owners on November 7, 2007 for $603,862.45.  (Pl. Ex. 10).  B.S.S.B. threatened litigation if Owners refused to accept the offer or pay the requested amount for B.S.S.B.'s claims.  (Pl. Ex. 10).  Owners did not agree to the settlement offer.

Owners did not pay B.S.S.B. any additional money under the policy until March 10, 2008.  (Pl. Ex. 19 and 20).  By then, B.S.S.B. had completed voluntary Chapter Thirteen bankruptcy proceedings.  As part of the bankruptcy settlement, N. Krupa Corporation, a B.S.S.B. creditor, took title to the hotel property.  (Pl. Ex. 24).  As a result, Owners' March 10, 2008 payment of $59,924.80 for B.S.S.B.'s property damage claim went to N. Krupa Corporation.  (Dipakkumar Ghodiwala Dep. at 13).

Owners March 10, 2008 payment included $37,085.25 to cover B.S.S.B.'s loss of business income claim.[3]  (Pl. Exhibit 19, 20, and 26).  B.S.S.B. received this payment.  To determine the amount of lost income Owners hired Neal Cason ("Cason"), a certified public accountant.  (Def. Ex. G).  Cason reviewed the hotel's income, sales, and use tax returns, its monthly financial statements for 2006 and 2007, as well as the hotel's yearly financial statements for 2005 through 2007.  (Def.

---

[2] B.S.S.B. lost $36,641.07 in 2005 (Def. Ex. J) and in 2006, had a profit of $5,138.29 (Def. Ex. I).

[3] Owners did not adopt Smith's initial determination that B.S.S.B. did not have a loss of business income claim.

5

Ex. G).  From these documents, Cason concluded that the hotel's loss of business income for five months of diminished occupancy totaled $37,085.25.  (Def. Ex. H).

On July 11, 2008, B.S.S.B. filed a complaint against Owners in the Superior Court of Cook County, Georgia, seeking additional payment under the policy for loss of business income and extra expenses.[4]  It also made bad faith, consequential damages, and reasonable attorney's fees claims.  On August 15, 2008, Owners removed the case to this Court pursuant to 28 U.S.C. § 1441.  Owners filed its Motion for Summary Judgment on April 28, 2009, seeking judgment as a matter of law on all of B.S.S.B.'s claims.  Filed contemporaneously with its Motion for Summary Judgment, is Owners' Motion to Exclude the Expert Testimony of Huggins.

## III.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment must be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In ruling on a defendant's motion for summary judgment, the court takes the facts in the light most favorable to the plaintiff.  Stanley v. City of Dalton, 219 F.3d 1280, 1287 (11th Cir. 2000).  The court may not, however, make

---

[4] B.S.S.B. does not have title to the hotel property; thus, any claim for additional payment for the hotel's property damage lies with N. Kupta Corporation.

6

credibility determinations or weigh the evidence.  <u>Anderson v. Liberty Lobby, Inc.,</u> 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

The initial burden lies on the movant to demonstrate that the nonmovant lacks evidence to support an essential element of its claim.  <u>Lowe v. Aldridge</u>, 958 F.2d 1565, 1569 (11th Cir. 1992).  The movant must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotation marks omitted).

If the moving party meets his burden, then the burden shifts to the nonmovant, who must come forward with some evidence that would allow a jury to find in his favor, even if the parties dispute that evidence.  <u>Lowe</u>, 958 F.2d at 1569.  If the evidence that the nonmovant presents, however, is "not significantly probative" or "merely colorable," then summary judgment may be granted.  <u>Liberty Lobby</u>, 477 U.S. at  249.

### B.     Breach of Contract

B.S.S.B. asserts that Owners breached the terms of the policy because B.S.S.B. was owed more in damages for extra expenses and loss of business income than the $37,085.25 that Owners paid.

### 1.    Damages for Extra Expenses

The policy provides that Owners will pay extra expense.  Extra expense is

defined in the policy as "necessary expenses [the insured] incur[s] during the 'period of restoration' that [the insured] would not have incurred if there had been no direct loss or damage to property caused by or resulting from a Covered Cause of Loss."

In support of its position that it is owed money under the extra expense provision, B.S.S.B. refers the Court to Mr. Ghodiwala's affidavit, which states that Mr. Ghodiwala was never paid $1,500.00 for the repairs he made to the hotel's roof and was never paid $500.00 for the water cleaning.  Owners contends that B.S.S.B. never requested payment for extra expenses until it did so in its response brief. Because there is no evidence that B.S.S.B. made a timely claim for extra expenses, Owners asserts B.S.S.B. cannot defeat summary judgment on the extra expense claim.

The Court agrees with Owners.  To have a claim for extra expense, B.S.S.B. must have demanded payment from Owners for the costs of cleaning the water and repairing the room.   B.S.S.B. has not presented the Court with any evidence showing that before this case commenced, or during discovery, it asked Owners to reimburse it for the expenses it incurred in repairing the roof and cleaning the water. On this basis alone, the Court could conclude that B.S.S.B. has not carried its summary judgment burden.  See Hammer v. Slater, 20 F.3d 1137, 1141 (11th Cir. 1994) (stating that "the non-moving party must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.").

8

The Court has also independently reviewed the record to determine whether there is evidence that B.S.S.B. made a claim for these extra expenses prior to filing its reply brief.  Finding no such evidence, the Court concludes that B.S.S.B. has not created a genuine issue of fact as to whether it is entitled to damages for extra expenses.

### 2.    Damages for Loss of Business Income

The policy provides that Owners will pay for the actual loss of business income an insured sustains "due to the necessary suspension of [its] 'operations' during the 'period of restoration.'"  Business income is defined as the "Net Income (Net Profit or Loss before income taxes) that would have been earned or occurred."  Owners will not pay for loss of business income once "[the insured] could restore [its] 'operations' with reasonable speed, to the condition that would have existed if no direct physical loss or damage occurred."  Reading these provisions together, the policy covers lost profits incurred by the insured until repairs to the insured property could reasonably be made.

Owners paid B.S.S.B. $37,085.25 for the loss of business income B.S.S.B. incurred due to the storm's damage.  Owners determined that B.S.S.B. lost $37,085.25 in profits during the five months following the storm.

B.S.S.B. first argues that this amount is insufficient because it could not reasonably restore its operations within five months.  According to B.S.S.B., it was entitled to receive loss of business income payments from Owners at least until

9

March 10, 2008, the date that Owners paid the property damage claim.  Without payments from Owners, B.S.S.B. could not complete the repairs.  In response, Owners argues that B.S.S.B. admitted it could reasonably complete repairs within three months time and that Owners generously awarded B.S.S.B. an additional two months of compensation for lost business income.

Although not briefed by the parties, the initial issue before the Court is whether the policy establishes that loss of business income coverage extends until the date the insured can afford to pay for the repairs or until the date that Owners pays the insured's property damage claim.  According to the policy, coverage ends on the date that the insured "could" restore its operations.  It does not provide coverage until the date that the insured "does" restore its operations.  The Court finds that the use of the word "could" means that coverage exists for the period of time the repairs, if they were made, would reasonably take to complete.  This conclusion is supported by common sense.  If Owners was required to provide loss of business income coverage until insureds could afford repairs or until it made payment on a property claim, then insureds would have the incentive to delay settling their property damage claims.  Coverage under the loss of business income provision would also be inequitable because the amount paid under the policy would differ depending on whether the insured had the financial means to make the repairs.  For these reasons, the Court concludes that the policy clearly establishes that loss of business income coverage lasts until repairs could reasonably be made, regardless of

10

whether the insured can afford to pay for the repairs and irrespective of the date that Owners pays for the property damage.

In this case, Huggins admitted that the repairs to the hotel could be completed within three months.  Based on this admission, B.S.S.B. is entitled to three months of lost business income.  B.S.S.B. may survive summary judgment on its loss of income claim if it presents evidence that it is owed more than $37,085.25 for three months of lost profits.

Under Georgia law, "to recover lost profits one must show the probable gain with great specificity as well as expenses incurred in realizing such profits. In short, the gross amount minus expenses equals the amount of recovery."[5] <u>Grossberg v. Judson Gilmore Assoc., Inc.</u>, 196 Ga. App. 107, 108-09 (Ga. Ct. App. 1990) (citation omitted).  To establish "probable gain with great specificity" the business must have a sufficient operations history.  The history must sufficiently show the business' revenues over time and the cost of doing business.  <u>Champion v. Dodson</u>, 587 S.E.2d 402, 406 n. 3 (Ga. Ct. App. 2003).  If such revenue and costs can be shown with reasonable certainty, then the lost profits can be determined from historic revenue levels, less historic costs of doing business.  <u>Id.</u>

To show that its lost profits exceeded $37,085.25, B.S.S.B. directs the Court to Huggins' projected revenue report, the hotel's tax bills, and an affidavit from Mr.

---

[5] The Court applies Georgia law to this contract dispute because Owners' Motion for Summary Judgment indicates that the insurance contract is governed by Georgia law and B.S.S.B. has not argued that another state's law applies.

Ghodiwala itemizing the normal monthly operating expenses of the hotel.[6]  Owners

argues that Huggins' projected revenue report is based on improper assumptions,

and thus his conclusions cannot support B.S.S.B.'s additional lost profits claim.[7]  The

Court agrees.

In estimating the projected monthly revenue of the hotel in 2007, Huggins first

determined the percentage increase in revenue for each month in 2006 from each

month in 2005.  He then took the monthly incomes in 2006 and multiplied them by

the percent increase to project monthly revenues in 2007.  For example, the October

2006 revenue was 2.82% greater than the revenue in October 2005; thus, the

projected October 2007 revenue was $61,545.80, which was 2.82% greater than the

revenue in October 2006.

Huggins' monthly 2007 revenue projections are problematic because they are

based solely on the monthly revenues for two years of the hotel's operation history.

Although the hotel did business before 2005, Huggins did not include in his

calculations the hotel's revenues prior to 2005; thus, his conclusions are not based

---

[6] B.S.S.B. states in its response brief that the hotel's tax bills, and Mr.
Ghodiwala's affidavit are sufficient evidence from which a jury could determine lost
profits.  While it is true that juries can rely on this type of evidence, the issue in this case
is whether this evidence shows that B.S.S.B. is entitled to more than $37.085.25 in lost
profits.  B.S.S.B. misses the mark in failing to point to figures showing it is reasonably
certain its lost profits exceeded $37.085.25.

[7] Citing no law, Owners also argues that lost profits cannot be calculated solely
on the testimony of lay witnesses.  While there is complexity to calculating lost profits,
the Court has found no case establishing a per se bar on lay witness testimony.  The
Court therefore assumes that Huggins' lay witness testimony would be admissible at
trial.

on a sufficient history of the hotel's revenues.  Because of this flaw, the Court finds that Huggins' projected revenue conclusions, though possible, are not reasonably certain.

The tax statements likewise do not show that it is reasonably certain the hotel's revenue would have increased so much that in the three months following the storm, B.S.S.B. would have turned a greater profit than $37,085.25.  B.S.S.B. does not refer the Court to any figures or numbers in the tax returns to support its position. Thus, B.S.S.B. has merely made a conclusory allegation in its response brief. Conclusory allegations do not satisfy the non-movant's burden on summary judgment.  Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).

The Court has nevertheless independently reviewed the tax statements and other record evidence showing B.S.S.B.'s gross monthly income in 2005, 2006, and 2007.  From the numbers, the Court cannot find that it is reasonably certain that B.S.S.B.'s lost income for three months following the storm exceeded $37,085.25. Persuasive to the Court is that the total revenue of the hotel from July to October in 2005 was $21,950.46 and the total revenue from July to October in 2006 was $27,026.58.  If the total revenue for the hotel in July through October of 2005 and 2006 never exceeded $30,000.00, then the Court cannot believe that the hotel's profit could have exceeded $37,085.25 during July through October of 2007.[8]

---

[8] B.S.S.B. may have been entitled to lost profits through November.  Even so, the Court cannot find any evidence in the tax statements showing that lost profits paid through November would have exceeded $37,085.25.

Nor has B.S.S.B. presented evidence showing its expenses to a reasonable degree of certainty.  Mr. Godiwhala's affidavit does not contain all of the operating costs of the hotel.  Other record evidence establishes that, in addition to the expenses set forth in the affidavit, the hotel pays licensing fees, and owes fees to its officers.  Without more reasonably certain evidence of the hotel's expenses, the Court cannot conclude that B.B.S.B. has proven it is reasonably certain its lost profits exceeded $37,085.25.

The Court notes that based on the hotel's profitability record, any award of lost profits under the policy is generous.  In 2005, the hotel made no profit and lost $36,641.07, while in 2006 the hotel made a profit of $5,138.29. Ordinarily lost profits may be recovered only if the business "has a proven track record of profitability." Johnson County Sch. Dist. v. Greater Savannah Lawn Care, 629 S.E.2d 271, 274 (Ga. Ct. App. 2006) (citation omitted).  Because there is no evidence showing B.S.S.B. has a proven track record of profitability, it would not be entitled to recover any lost profits, let alone more than $37,085.25.

Huggins' report concerning B.S.S.B.'s projected lost revenue, the tax returns, and Mr. Ghodiwala's affidavit do not contain any evidence showing that lost profits for the three months following the date of the storm exceeded $37,085.25.  The Court has also not independently found other evidence in the record showing B.S.S.B. was entitled to more than what Owners paid under the policy.  Accordingly, Owners' Motion for Summary Judgment is granted as to B.S.S.B.'s loss of business

14

income claim.

**C.    B.S.S.B.'s Claim for Bad Faith Under Ga. Code Ann. § 33-4-6**

Section 33-4-6(a) provides that damages may be recovered for an insurer's bad faith conduct when: (1) the insurer refuses to pay a covered loss within 60 days after a demand for payment has been made by the insured; and (2) the court makes a finding that the insurer's refusal to pay was in bad faith.  Ga. Code Ann. § 33-4-6. Penalties for bad faith are not authorized where the insurance company has any reasonable ground to contest the claim and where there is a disputed question of fact.  Allstate Ins. Co. v. Smith, 597 S.E.2d 500, 503 (Ga. Ct. App. 2004).

The Court chooses to address first whether B.S.S.B. has presented evidence showing that Owners did not have any reasonable ground to contest the loss of business income claim or that there is no disputed question of fact.

In support of its assertion that Owners acted in bad faith, B.S.S.B. states that Owners has not "articulated any reason why it took from July 14, 2007 when the loss occurred until March 10, 2008 to pay any amount whatsoever of the loss of business income and extra expense [claims]."  Owners responds that it did not pay B.S.S.B.'s claim for loss of business income until March 10, 2008, because up until then, there was a genuine dispute of what lost business income was owed to B.S.S.B. under the policy.

On September 13, 2007, B.S.S.B. provided Owners the amount of lost business income it believed it was owed under the policy.  On October 19, 2007,

15

Owners wrote B.S.S.B. stating that it needed supporting documentation from B.S.S.B. before it could consider a loss of business income claim.[9]  Owners then hired Cason to determine what lost profits were owed to B.S.S.B.  Owners did not receive Cason's report until February 20, 2008.

Aside from the mere passage of time, B.S.S.B. has pointed to no evidence that Owners acted in bad faith in paying $37,085.25 in lost business income on March 10, 2008.  Owners, however, has presented evidence showing that the reason for the delay was because there was a dispute over how much was owed under the lost business income provision of the policy.  From this evidence, the Court grants summary judgment to Owners on B.S.S.B.'s claim for bad faith.

### D.    Consequential Damages

B.S.S.B. states in its complaint that it is entitled to consequential damages due to Owners failure to timely investigate and pay B.S.S.B.'s claims.  In its response brief, B.S.S.B. argues that Owners refused to timely pay its claims.  Thus, B.S.S.B. seeks consequential damages for Owners' alleged delay in paying B.S.S.B.'s claims.

The Court finds that B.S.S.B.'s claim for consequential damages falls within Georgia's insurer bad faith statute, Ga. Code Ann. § 33-4-6.  The statute exists to "penalize insurers that delay payments without good cause."  Howell v. Southern Heritage Ins. Co., 448 S.E.2d 275, 275 (Ga. Ct. App. 1994).

---

[9] B.S.S.B. has not argued that Owner's request for additional documentation was unreasonable.

Section 33-4-6 provides the exclusive remedy for an insurer's bad faith refusal to pay insurance proceeds.  McCall v. Allstate Ins. Co., 310 S.E.2d 513, 515-16 (Ga. 1984).  As a result, B.S.S.B. has no independent claim for consequential damages. Summary judgment is granted to Owners on this claim.


## IV.   CONCLUSION

For the foregoing reasons, Owners' Summary Judgment Motion is granted and its Motion to Exclude John Huggins as an Expert Witness is denied as moot.

**SO ORDERED**, this the 20th day of January, 2010.


*s/  Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

lmc